**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SCOTT HERTZOG,<br><br>                    Plaintiff,<br><br>          v.<br><br>KEVIN HOLLERAN, EIFION JONES, ALBERTA INVESTMENT MANAGEMENT CORPORATION, CCMP CAPITAL ADVISORS, LP, CCMP CAPITAL INVESTORS III, L.P., CCMP CAPITAL INVESTORS III (EMPLOYEE), L.P., CCMP CAPITAL ASSOCIATES III, L.P., CCMP CAPITAL ASSOCIATES III GP, LLC, CCMP CAPITAL, LP, AND CCMP CAPITAL GP, LLC, MSD AQUA PARTNERS, LLC, MSD PARTNERS, L.P., MSD PARTNERS (GP), LLC, MARK MCFADDEN, GREG BRENNEMAN, TIMOTHY WALSH, CHRISTOPHER BERTRAND, KEVIN BROWN, STEPHEN J. FELICE, DIANE S. DAYHOFF, LAWRENCE H. SILBER, ARTHUR L. SOUCY, LORI A. WALKER, EDWARD D. WARD, ALI AFRAZ, and JASON PETERS<br><br>                    Defendants,<br>and<br><br>HAYWARD HOLDINGS INC.,<br><br>                    Nominal Defendant. | Civil Action No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Scott Hertzog ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Hayward Holdings Inc. ("Hayward" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers for Defendants' (defined below) breaches of fiduciary duties, breach of duties owed by controlling shareholder, unjust enrichment, waste of corporate assets, aiding and abetting, and

1

violations of Sections 10(b), Section 14(a) and Section 29 (b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution and indemnification under Section 21 of the Exchange Act. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Hayward, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This shareholder derivative complaint exposes a scheme by controlling shareholders to inflate Haywards sales numbers by forcing distributors to take product throughout 2021 and early 2022 to allow individual insiders to offload massive amounts of stock (Hayward's CEO offloaded 7.4% of his holdings in May 2025 alone) and while controlling entity shareholders defendants CCMP and AIMCO dumped stock throughout 2022 and foisted inflated stock on Hayward in a repurchase.  These insider transactions occurred while officers or directors permitted a channel stuffing scheme—pressuring distributors to accept excess inventory beyond market demand, while falsely characterizing these sales as reflecting robust consumer demand.

2.      Hayward's business involves the design, manufacturing, and global marketing of a comprehensive range of pool equipment and advanced automation systems. Operating in North America, Europe, and various international markets, the company's product portfolio encompasses an array of pool equipment such as pumps, filters, and robotic cleaners.

3.      Hayward's business prospects can be tenuous and volatile driven by the climate of the luxury housing market and distributors' appetite for inventory.

4.      Following its IPO in 2021, Hayward touted strong revenue growth and increasing demand for products despite its sales channel being mostly limited to specialty distributors who have exclusive right to resell to pool builders, retailers, and servicers.  These specialty distributors accounted for over 75% of Hayward's revenue, and officers and directors were keen to claim that the metrics for this channel were growing and robust.

5.      In promoting these overly optimistic sales figures for specialty distributors, Defendants repeatedly represented to investors that distributor inventory levels were aligned with demand, when in fact distributor inventories were bloated and stagnant.

6.      These misrepresentations allowed Hayward to artificially inflate revenue, conceal slowing demand, and maintain an inflated stock price in anticipation of massive sales in 2022.

7.      Ultimately, when the truth about distributors drowning in excess product, leading to massive write-downs, came to light, the Company was forced to reduce guidance, acknowledge excess channel inventory, and its stock price plummeted, causing significant damage to shareholders and the Company.

8.      A securities class action soon followed with an initial complaint filed August 2, 2023.

9.      The August 2, 2023 securities class action complaint was filed in the U.S. District Court for the District of New Jersey and later amended naming Hayward and Kevin Holleran, Eifion Jones, CCMP Capital Advisors, LP, CMP Capital Investors III, L.P., CCMP Capital Investors III (EMPLOYEE), L.P., CCMP Capital Associates III, L.P., CCMP Capital Associates III GP, LLC, CCMP CAPITAL, LP, AND CCMP Capital GP, LLC, MSD

Aqua Partners, LLC, MSD Partners, L.P., MSD Partners (GP), LLC, Mark McFadden, Greg Brenneman, Timothy Walsh, Christopher Bertrand, and Kevin Brown as Defendants, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. The complaint claims that they engaged in a scheme to conceal the Company's significant contingent tax liabilities while issuing debt securities based on incomplete public disclosures (the "Securities Action").

10.    On June 4, 2025, U.S. District Judge William J. Martini denied the defendants' motion to dismiss the Securities Class Action in part, finding, *inter alia*, that the plaintiffs had plausibly alleged that Defendants' failure to disclose the true risks Hayward faced, and that the Amended Complaint adequately alleged facts raising a strong inference of scienter.  This Amended Complaint was supported by the multiple confidential witnesses ("CW") who confirmed that prior to the Relevant Period, by mid-2021, the channel's inventory levels had recovered, and the channel had already purchased and generally had on hand more than sufficient inventory to meet downstream demand in the short and long term.  The court also made significant rulings regarding the sufficiency of the pleading of "control" of Hayward by defendants CCMP MSO AI MCO and their director designees who are named here as defendants.

11.    The Plaintiff did not request the Board of Directors to pursue the claims outlined herein. As explained below, a clear majority of the current Board members are either interested in the alleged wrongdoing, lack the independence for a pre-suit demand under Delaware law, have prejudged the claims asserted herein and/or are otherwise unable to exercise objective judgment in considering a shareholder demand. Consequently, the demand is exempted as futile.

4

## PARTIES

### A.    Plaintiff

12.    Plaintiff currently holds shares of Hayward common stock and has been a continuous holder at all relevant times. Nominal Defendant.

### B.    Nominal Defendant

13.    Hayward is incorporated under the laws of Delaware with its principal executive offices located at 400 Connell Drive, Suite 6100, Berkeley Heights, New Jersey. Hayward's common stock trades on the NYSE under the ticker symbol "HAYW."

### C.    Entity Defendants Which Sponsored Hayward's IPO and Controlled Hayward ("Control Defendants")

#### 1.    Alberta Investment Management Corporation

14.    Alberta Investment Management Corporation ("AIMCo") is a Canadian institutional investment manager that sometimes works with private equity firms targeting companies for buyout by acting as a minority investor. According to AIMCo's website, it "invests selectively with the world's leading private equity firms," and its strategy "focuses on co-control and minority investment positions in private companies, alongside our Private Equity Fund partners." AIMCo's website lists CCMP Capital as a Fund Partner, and it has previously partnered with the entities affiliated with CCMP Capital to back other companies, including the company Milacron, which entities affiliated with CCMP Capital acquired in 2012 and took public in 2015, also with AIMCo as a minority shareholder. During the Class Period, AIMCo relied upon the CCMP Entities to advise it and to manage AIMCo's investment in Hayward. As a result of this relationship, the CCMP Entities had the ability to direct and/or substantially influence the way AIMCo voted its Hayward shares. The CCMP Entities also had the ability to direct and/or substantially influence the timing and amount of AIMCo's sales of Hayward stock.

### 2.    CCMP

15.    CCMP is an investment firm that, among other things, acquires and sells companies, and operates through various related entities. During the Relevant Period, Hayward was controlled by the seven affiliated CCMP entities named as Defendants below (collectively, the "CCMP Entities") along with defendant MSD and Aimco. The CCMP Entities were one of Hayward's two largest shareholders. Prior to the March 2021 IPO, the CCMP Entities owned approximately 38.1% of Hayward's outstanding common stock; following the IPO, they continued to own approximately 31% of Hayward's shares. In addition, three executives of the CCMP Entities, defendants Mark McFadden, Timothy Walsh, and Greg Brenneman, sat on Hayward's Board as non-independent directors. The CCMP Entities, together with McFadden, Walsh, and Brenneman are collectively referred to herein as "CCMP." CCMP had the power and/or potential power to control Hayward and exercised actual control over Hayward through various means detailed below, including with respect to the sale of CCMO stock to the public and back to Hayward.

16.    Defendant CCMP Capital Advisors, LP ("CCMP Capital"), is a New York-based private equity firm specializing in buyouts and growth equity investments. According to CCMP Capital, it "primarily seeks to make control investments" in privately-owned companies in the consumer, industrial, and healthcare sector, and acts "primarily as the lead investor" in those companies.

17.    Defendant CCMP Capital Investors III, L.P., is a New York-based investment fund affiliated with CCMP Capital that directly held Hayward common stock during the Relevant Period.

18. Defendant CCMP Capital Investors III (Employee), L.P., is a New York-based investment fund affiliated with CCMP Capital that directly held Hayward common stock during the Relevant Period.

19. Defendant CCMP Capital Associates III, L.P., is the New York-based general partner of CCMP Capital Investors III, L.P., and CCMP Capital Investors III (Employee), L.P. (the "CCMP Funds"), and an affiliate of CCMP Capital. During the Relevant Period, CCMP Capital Associates III, L.P., was the beneficial owner of Hayward common stock held by the CCMP Funds.

20. Defendant CCMP Capital Associates III GP, LLC, is the New York-based general partner of CCMP Capital Associates III, L.P., and an affiliate of CCMP Capital. During the Relevant Period, CCMP Capital Associates III, GP, LLC, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

21. Defendant CCMP Capital, LP, is a New York-based entity that owns CCMP Capital Associates III, GP, LLC, and an affiliate of CCMP Capital. During the Relevant Period, CCMP Capital, LP, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

22. Defendant CCMP Capital GP, LLC, is the New York-based general partner of CCMP Capital, LP, and an affiliate of CCMP Capital. During the Relevant Period, CCMP Capital GP, LLC, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

### 3. The MSD Defendants

23. MSD is an investment firm that, among other things, acquires and sells companies, and operates through various related entities. During the Relevant Period, Hayward

was also controlled by the three affiliated MSD entities named as Defendants below (collectively, "MSD Entities"). Along with the CCMP Entities, the MSD Entities were Hayward's largest shareholder.

24.     Prior to the March 2021 IPO, the MSD Entities owned approximately 38.1% of Hayward's outstanding common stock; following the IPO, they continued to own approximately 31% of Hayward's shares. In addition, two executives of the MSD Entities, Christopher Bertrand and Kevin Brown, sat on Hayward's Board of Directors as non-independent directors. Those two executives are also named as Defendants below. The MSD Entities, together with Bertrand and Brown are collectively referred to herein as "MSD." MSD had the power and/or potential power to control Hayward and exercised actual control over Hayward through various means that are described in more detail below, including by approving CCMP and Aimco's registration of stock, subsequent sale thereof to the public and back to Hayward.

25.     Defendant MSD Aqua Partners, LLC, is a New York-based investment fund that directly held Hayward common stock during the Relevant Period (the "MSD Fund").

26.     Defendant MSD Partners, L.P., is the New York-based investment manager of MSD Aqua Partners, LLC. During the Relevant Period, MSD Partners, L.P. was the beneficial owner of Hayward common stock directly held by the MSD Fund.

27.     Defendant MSD Partners (GP), LLC, is the general partner of MSD Partners, L.P. During the Relevant Period, MSD Partners (GP), LLC, was the beneficial owner of Hayward common stock directly held by the MSD Fund.

**D.    <u>Individual Defendants</u>**

28.     Defendant Kevin Holleran ("Holleran") has served as President, Chief Executive Officer ("CEO"), and as a member of the Board since August 2019. According to the Company's

public filings, Defendant Holleran received $5,620,709 in 2022 in compensation from the Company.

29.     Defendant Stephen J. Felice ("Felice") serves as Chairman of the Board and has served as a member of the Board since May 2018. Defendant Felice serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant Felice received $310,000 in 2022 in compensation from the Company.

30.     Defendant Eifion Jones ("Jones") was at all relevant times Hayward's CFO and Senior Vice President. During the Relevant Period, Defendant Jones sold 189,945 personally held Hayward shares for proceeds of $3,292,353, which amounted to 52.0% percent of his holdings at the start of and acquired during the Relevant Period.

31.     Defendant Christopher F. Bertrand ("Bertrand") was a non-independent member of Hayward's Board during the Relevant Period. He served on Hayward's Board beginning in 2020 and was a member of Hayward's three-person Audit Committee during Fiscal Year 2021 until February 2022. During the Relevant Period, Bertrand was also the Managing Director of Defendant MSD Partners, L.P.'s Private Capital Group. Defendant Bertrand signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement. Additionally, Defendant Bertrand reviewed and approved all financial statements and disclosures published by Hayward during his tenure on the Audit Committee, including Hayward's false and misleading quarterly financial statement (Form 10-Q) for the third quarter of 2021 ("3Q- 21").

32.     Defendant Kevin D. Brown ("Brown") was a non-independent member of Hayward's Board during the Relevant Period. He served on Hayward's Board beginning in 2017

and was a member of Hayward's three-person Compensation Committee along with Defendant McFadden. During the Relevant Period, Brown was also Co-Head of Defendant MSD Partners, L.P.'s Private Capital Group. He signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

33.    Defendant Diane S. Dayhoff ("Dayhoff") has served as a member of the Board since March 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Dayhoff received $227,500 in 2022 in compensation from the Company.

34.    Defendant Lawrence H. Silber ("Silber") has served as a member of the Board since November 2019 and serves as Chair of the Compensation Committee. According to the Company's public filings, Defendant Silber received $227,500 in 2022 in compensation from the Company.

35.    Defendant Arthur L. Soucy ("Soucy") has served as a member of the Board since June 2017 and serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Soucy received $205,000 in 2022 in compensation from the Company.

36.    Defendant Lori A. Walker ("Walker") has served as a member of the Board since March 2021 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Walker received $242,500 in 2022 in compensation from the Company.

37.    Defendant Edward D. Ward ("Ward") has served as a member of the Board since April 2022 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Ward received $174,333 in 2022 in compensation from the Company.

38.     Defendant Mark McFadden ("McFadden") served as a member of the Board between June 2017 and September 2023 while he was also an executive at CCMP.

39.     Defendant Gregory D. Brenneman ("Brenneman") was a non-independent member of Hayward's Board of Directors during the Relevant Period and served on Hayward's Board from 2017 to 2023. During that time, Brenneman was also a principal owner of Defendant CCMP Capital, LP, and served on the investment committee of Defendant CCMP Capital GP, LLC, with respect to shares of Hayward's common stock; he also served as the Executive Chairman of CCMP Capital Advisors, LP. Brenneman signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

40.     Defendant Timothy Walsh ("Walsh") was a non-independent member of Hayward's Board during the Relevant Period. He served on Hayward's Board from 2017 to 2023 and was the Chairperson of Hayward's three-person Nominating and Corporate Governance Committee. During that time, Walsh was also a principal owner of Defendant CCMP Capital, LP, and served on the investment committee of Defendant CCMP Capital GP, LLC, with respect to shares of Hayward's common stock; he also served as the President and CEO of CCMP Capital Advisors, LP. Defendant Walsh signed Hayward's false and misleading March 9, 2022 Form 10- K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

41.     Defendant Ali Afraz ("Afraz") served as a member of the Board between February 2018 and May 2022 and in that capacity signed the materially false and misleading 10-K report that was issued on March 9, 2022 and was a director who solicited shareholders via the false 2022 proxy.

42.     Defendant Jason Peters ("Peters") served as a member of the Board between June 2017 and May 2022 and in that capacity signed the materially false and misleading 10-K report

that was issued on March 9, 2022 and was a director who solicited shareholders via the false 2022 proxy.

## A. **DUTIES IMPOSED BY HAYWARD'S CODE OF ETHICS**

43.     Hayward's Code of Ethics states that its purpose is to promote:

> (i) the honest and ethical conduct of Senior Executive and Financial Officers (as defined below), including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) full, fair, accurate, timely and understandable disclosure in periodic reports and documents required to be filed by Hayward Holdings, Inc. (the "Company") with the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company; and (iii) compliance with all applicable laws, rules and regulations that apply to the Company and its Senior Executive and Financial Officers.

44.     The code of ethics applies to the following senior executive and financial officers: "Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer), [Executive Vice President and Chief Commercial Officer] and the Treasurer and Corporate Controller (and any persons performing similar functions)."

45.     Compliance with the Code of Ethics "is a condition to employment for each Senior Executive and Financial Officer and any violations of this Code may result in disciplinary action, up to and including termination of employment."

46.     In a subsection titled "Accuracy of Company Records and Reporting," the Code of Ethics states, in pertinent part:

> Full, fair, accurate, timely and understandable disclosures in the Company's periodic reports filed with the SEC and in our other public communications is required by SEC rules and is essential to the Company's continued success. Each Senior Executive and Financial Officer is expected to exercise the highest standard of care in preparing such materials. The Company has established the

12

following guidelines in order to ensure the quality of its periodic reports:

- All Company accounting records, as well as reports produced from those records, must be kept and presented in accordance with the laws of each applicable jurisdiction;
- all records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
- the Company's accounting records must not contain any false or intentionally misleading entries;
- no transaction may be intentionally misclassified as to accounts, departments or accounting periods or in any other manner;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information may be concealed from the internal auditors or the independent auditors; and
- compliance with Generally Accepted Accounting Principles and the Company's system of internal accounting controls is required at all times.

47.    In a subsection titled "Compliance with Laws and Ethics Code," the Code of Ethics states, in pertinent part:

Senior Executive and Financial Officers must always act in good faith, responsibly, with due care and diligence and without knowingly misrepresenting material facts or allowing independent judgment to be subordinated to the best interests of the Company. Each Senior Executive and Financial Officer is expected to comply with both the letter and spirit of all applicable laws, governmental rules and regulations and this Code, and is expected to promptly report any suspected violations of applicable laws, governmental rules and regulations or this Code to the Compliance Officer.

## B. **DUTIES IMPOSED BY HAYWARD'S AUDIT COMMITTEE CHARTER**

48.    Hayward's Audit Committee Charter states that the purpose of the Audit Committee is to: "[O]versee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements."

49.    The Audit Committee Charter further states that the Audit Committee is responsible for:

> Assisting the Board in its oversight of (i) the integrity of the consolidated financial statements of the Company, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; (v) the Company's internal control over financial reporting; (vi) technology security; and (vii) related party transactions involving the Company and members of the Board and executive officers of the Company.

50.    In a subsection titled "Review and Discussion of Annual Financial Statements," the Audit Committee Charter states:

> The Audit Committee shall meet to review and discuss with management and the independent auditor the annual audited financial statements, including reviewing, to the extent applicable, specific disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in any Annual Report on Form 10-K required to be filed by the Company with the SEC.

51.    With respect to the Company's earnings press releases and financial forecasts, the Audit Committee Charter states that the Audit Committee shall: "[P]eriodically discuss with management the Company's earnings press releases, financial information and earnings guidance provided to analysts and rating agencies as well as any policies in respect thereof."

> 1.  Disclosure. The Audit Committee shall review disclosures about any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud involving

14

management or employees playing a significant role in the Company's internal controls, made to the Audit Committee by the Company's chief executive officer and chief financial officer, including, to the extent applicable, any disclosures made during their certification process for Annual Reports on Form 10- K and Quarterly Reports on Form 10-Q.

2. Internal Controls and Internal Controls Reports. The Audit Committee shall review and discuss with management, internal audit staff (or other personnel responsible for the internal audit function) and the independent auditor the adequacy of the Company's internal controls, any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies and, to the extent applicable, the Company's internal controls report and the independent auditor's internal controls report prior to the filing of any Annual Report on Form 10-K or any Quarterly Report on Form 10-Q required to be filed by the Company with the SEC.

52.    In a subsection titled "Risk Management," the Audit Committee Charter states that the Audit Committee shall: "[D]iscuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies."

## C.  DUTIES IMPOSED BY HAYWARD'S INSIDER TRADING POLCY

53.    Hayward's insider trading policy last updated January 10, 2024 states:

1.    Purpose. This Insider Trading Policy (this "Policy") provides guidelines with respect to transactions in the securities of Hayward Holdings, Inc. (the "Company") and the handling of confidential information about the Company and the companies with which the Company does business. The Company's Board of Directors (the "Board") has adopted this Policy to promote compliance with U.S. federal and state securities laws that prohibit certain persons who are aware of material nonpublic information about a company from: (i) trading in securities of that company; or (ii) providing such material nonpublic information to other persons who may trade on the basis of that information, commonly known as "tipping."

15

2.      <u>Persons Subject to this Policy</u>. This Policy applies to all directors, officers and employees of the Company and its subsidiaries. The same restrictions that apply to such directors, officers and employees also apply to (i) family members who reside with them, (ii) anyone else who lives in their household, (iii) any family members who do not live in their household but whose transactions in Company Securities (as defined below) are directed by them or are subject to their influence or control (such as parents or children who consult with them before they trade in Company Securities) and (iv) family trusts, family partnerships and similar entities controlled by them or any person described in clauses (i)-(iii) (collectively, "<u>Other Covered Persons</u>"). Directors, officers and employees are responsible for transactions by Other Covered Persons and for informing them of this Policy.

The Company may also determine that other persons should be subject to this Policy, such as contractors or consultants who have access to material nonpublic information. Any such other persons will be notified by the Compliance Officer.

3.      <u>Transactions Subject to this Policy</u>. This Policy applies to transactions (including gifts) in the Company's securities, including the Company's common stock, options to purchase common stock, restricted stock units or any other type of security that the Company may issue, including, but not limited to, preferred stock, convertible debt and warrants (collectively, "<u>Company Securities</u>").

4       <u>Individual Responsibility</u>. Persons subject to this Policy have ethical and legal obligations to maintain the confidentiality of information about the Company and to not engage in transactions in Company Securities while in possession of material nonpublic information. Each individual is responsible for making sure that he or she complies with this Policy, and that his or her Other Covered Persons also comply with this Policy. In all cases, the responsibility for determining whether an individual is in possession of material nonpublic information rests with that individual, and any action on the part of the Company, the Compliance Officer or any other employee or director pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws. Persons subject to this Policy could be subject to severe legal penalties and

disciplinary action by the Company for any conduct prohibited by this Policy or applicable securities laws, as described below in more detail under the heading "Consequences of Violations."

5.    <u>Administration of this Policy</u>. The Company's General Counsel or such other officer as is designated by the Chief Executive Officer shall serve, in consultation with the Chief Executive Officer, as the "<u>Compliance Officer</u>" for the purposes of this Policy, and in such role, shall be responsible for the administration of this Policy. In the absence of the Compliance Officer, another employee designated by the Compliance Officer (or, if the Compliance Officer is unavailable, by the Chief Executive Officer, and, if the Chief Executive Officer is unavailable, by the Chief Financial Officer) shall be responsible for administration of this Policy. All determinations and interpretations by the Compliance Officer or his or her designee shall be final and not subject to further review.

6.    <u>Statement of Policy</u>. It is the policy of the Company that a director, officer or other employee of the Company or its subsidiaries (or any other person designated by the Compliance Officer or his or her designee as subject to this Policy) who is aware of material nonpublic information relating to the Company may not directly or indirectly through Other Covered Persons:

- engage in transactions (including gifts) in Company Securities, except as otherwise specified in this Policy under the headings "Transactions Under Company Plans," "Transactions Not Involving a Purchase or Sale" and "Rule 10b5-1 Plans;
- pass material nonpublic information on to others or recommend to anyone the purchase or sale of any securities when they are aware of such information;
- disclose material nonpublic information to persons within the Company whose jobs do not require them to have that information, or anyone outside of the Company, including, but not limited to, family, friends, business associates, investors and expert consulting firms, unless any such disclosure is made in accordance with the Company's policies regarding the protection

or authorized external disclosure of information regarding the Company; or

- assist anyone engaged in the above activities in contravention of this Policy.

In addition, it is the policy of the Company that a director, officer or employee of the Company (or any other person designated by the Compliance Officer or his or her designee as subject to this Policy) who, in the course of working for the Company, learns of material nonpublic information about a company with which the Company does business, including a customer or supplier of the Company, may not trade in that company's securities until the information becomes public or is no longer material.

There are no exceptions to this Policy, except as specifically noted herein. Transactions that may be necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure), or small transactions, are not exempt from this Policy. The securities laws do not recognize any mitigating circumstances, and, in any event, even the appearance of an improper transaction must be avoided to preserve the Company's reputation for adhering to the highest standards of conduct.

7.    <u>Definition of Material Nonpublic Information</u>.

7.1    <u>Material Information</u>. Information is considered "material" if a reasonable investor would consider that information important in making a decision to buy, hold or sell securities. Any information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material. There is no bright-line standard for assessing materiality; rather, materiality is based on an assessment of all of the facts and circumstances and is often evaluated by enforcement authorities with the benefit of hindsight.

While it is not possible to define all categories of material information, the following are some examples of information that ordinarily would be regarded as material:

- projections of future earnings or losses, or other earnings guidance;
- changes to previously announced earnings guidance, or the decision to suspend earnings;

- a pending or proposed merger, acquisition or tender offer;
- a pending or proposed acquisition or disposition of a significant asset;
- a pending or proposed joint venture or licensing arrangement;
- a Company restructuring;
- significant related party transactions;
- a change in dividend policy, the declaration of a stock split or an offering of additional securities;
- bank borrowings or other financing transactions out of the ordinary course;
- the establishment of a repurchase program for Company Securities;
- a change in the Company's pricing or cost structure;
- major marketing changes;
- a change in management;
- a change in auditors or notification that the auditor's reports may no longer be relied upon;
- pending or threatened significant litigation, or the resolution of such litigation;
- significant regulatory developments;
- impending bankruptcy or the existence of severe liquidity problems;
- the gain or loss of a significant customer or supplier; and
- the imposition of a ban on trading in Company Securities or the securities of another company.

7.2    Nonpublic Information. Information that is not generally known or available to the public is generally considered to be nonpublic information. In order to establish that the information has been disclosed to the public, it may be necessary to demonstrate that the information has been widely disseminated. Information generally would be considered widely disseminated if it has been disclosed through the Dow Jones "broad tape," newswire services, a broadcast on widely-available radio or television programs, a widely-available pre-announced webcast, publication in a widely-available newspaper, magazine or news website, a pre-announced quarterly earnings release or public disclosure documents filed with the Securities and Exchange Commission (the "SEC") that are available on the SEC's website. By contrast, information would

generally <u>not</u> be considered widely disseminated if it is available only to the Company's employees.

Once information is widely disseminated, it is still necessary to afford the investing public sufficient time to absorb the information. As a general rule, information is considered nonpublic until the end of the second full trading day after the information is released. For example, if the Company announces financial earnings after market close on Monday or before trading begins on a Tuesday, the first time a director, officer or employee can buy or sell Company Securities is the opening of the market on Thursday (assuming he or she is not aware of other material nonpublic information at that time). However, if the Company announces earnings after trading begins on that Tuesday, the first time a director, officer or employee can buy or sell Company Securities is the opening of the market on Friday (again assuming he or she is not aware of other material nonpublic information at that time). Depending on the particular circumstances, the Company may determine that a longer or shorter period should apply to the release of specific material nonpublic information.

8.    <u>Transactions Under Company Plans</u>. This Policy does not apply in the case of the following transactions, except as specifically noted:

8.1    <u>Stock Option Exercises</u>. This Policy does not apply to the exercise of a stock option acquired pursuant to a Company equity incentive plan or to a transaction in which a person has elected to have the Company withhold shares subject to an option award to satisfy tax withholding requirements. This Policy does, however, apply to any sale of shares as part of a broker-assisted cashless exercise of an option, or any other market sale for the purpose of generating the cash needed to pay the exercise price of or taxes associated with an option.

8.2    <u>Restricted Stock and Similar Awards</u>. This Policy does not apply to the vesting of restricted stock, the settlement of restricted stock units, performance-based stock units or similar awards or to a transaction in which there is an election to have the Company withhold shares to satisfy tax

withholding requirements upon the vesting of any restricted stock or the vesting or settlement of any restricted stock unit or performance-based stock unit. This Policy does apply, however, to any market sale of shares received upon settlement of any restricted stock unit, performance-based stock unit or similar award.

8.3    Employee Stock Purchase Plan. This Policy does not apply to periodic purchases under a Company employee stock purchase plan, if such plan exists, that are made as the result of an election made at the beginning of the purchase period. This Policy would apply, however, to an initial decision to participate in the plan or a decision to increase the level of contribution in a subsequent purchase period. It would also apply to any sales of shares purchased under the plan.

8.4    401(k) Plan. This Policy does not apply to purchases of Company Securities in the Company's 401(k) plan as a result of periodic contributions made pursuant to payroll deduction. The Policy does apply, however, to initial elections to participate, and increases or decreases in the level of participation, in a Company stock fund and transfers in or out of a Company stock fund (including in connection with a plan loan).

9.    Transactions with the Company. Any purchase of Company Securities from the Company or sales of Company Securities to the Company not already identified in Section 8 are not subject to this Policy.

10.    Transactions in Mutual Funds. In addition, transactions in mutual funds that are invested in Company Securities are not transactions subject to this Policy.

11.    Special and Prohibited Transactions. The Company has determined that the following transactions present a heightened legal risk and the potential appearance of improper or inappropriate conduct. It is therefore the Company's policy that the persons identified below may not engage in any of the following transactions:

11.1    Short-Term Trading. Short-term trading of Company Securities may be distracting to the person engaging in such trades and may unduly focus such person on the Company's short-term performance instead of the

21

Company's long-term objectives. For these reasons, and in accordance with Section 16(b) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), any director or executive officer of the Company who purchases Company Securities may not sell any Company Securities of the same class during the six months following the purchase (or vice versa).

11.2   <u>Short Sales</u>. Short sales of Company Securities (*i.e.,* the sale of a security that the seller does not own) may evidence an expectation on the part of the seller that the securities will decline in value and therefore have the potential to signal to the market that the seller lacks confidence in the Company's prospects. In addition, short sales may reduce a seller's incentive to seek to improve the Company's performance if the seller could benefit from a decline in value of the Company's securities. For these reasons, persons covered by this Policy are prohibited from engaging in any short sales of Company Securities. In addition, Section 16(c) of the Exchange Act prohibits executive officers and directors from engaging in short sales. Short sales arising from certain types of hedging transactions are also governed by the paragraph below captioned "Hedging Transactions."

11.3   <u>Publicly Traded Options</u>. Given the relatively short term of publicly traded options, transactions in options may create the appearance that a director, officer or employee is trading based on material nonpublic information and focus such individual's attention on short-term performance at the expense of the Company's long-term objectives. Accordingly, persons covered by this Policy are prohibited from engaging in any transactions in put options, call options or other derivative securities on an exchange or in any other organized market.

11.4   <u>Hedging Transactions</u>. Hedging or monetization transactions can be accomplished through a number of possible mechanisms, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds. Such hedging transactions may permit a director, officer or employee to continue to own Company Securities obtained through employee benefit plans or otherwise, but without the full risks and rewards of ownership. When that occurs, such

individual may no longer have the same objectives as the Company's other shareholders.

Therefore, persons covered by this Policy are prohibited from engaging in any such transactions.

11.5    <u>Margin Accounts and Pledged Securities</u>. Securities held in a margin account as collateral for a margin loan may be sold by the broker without the customer's consent if the customer fails to meet a margin call. Similarly, securities pledged (or hypothecated) as collateral for a loan may be sold in foreclosure if the borrower defaults on the loan. Because a margin sale or foreclosure sale may occur at a time when the pledgor is aware of material nonpublic information or otherwise is not permitted to trade in Company Securities, persons covered by this Policy are prohibited from holding Company Securities in a margin account or otherwise pledging Company Securities as collateral for a loan. An exception may be granted where an individual wishes to pledge Company Securities as collateral for a loan (not including margin debt) and clearly demonstrates the financial capacity to repay the loan without resorting to the pledged securities. If an individual wishes to pledge Company Securities as collateral for a loan, he or she must submit a request for approval to the Compliance Officer at least two weeks prior to the proposed execution of documents evidencing the proposed pledge.

11.6    <u>Standing and Limit Orders</u>. Standing and limit orders (except standing and limit orders under Rule 10b5-1 Plans, as described below) create heightened risks for insider trading violations similar to the use of margin accounts. There is no control over the timing of purchases or sales that result from standing instructions to a broker, and as a result the broker could execute a transaction when a director, officer or other employee is in possession of material nonpublic information. The Company therefore prohibits placing standing or limit orders on Company Securities other than pursuant to Rule 10b5-1 Plans.

12.    <u>Rule 10b5-1 Plans</u>. Rule 10b5-1(c) under the Exchange Act provides a defense from insider trading liability under Rule 10b5-1. In order to be eligible to rely on this defense, a person subject to this Policy must enter into a plan for transactions in Company Securities that meets certain

conditions specified in Rule 10b5-1(c) (a "<u>Rule 10b5-1 Plan</u>"). If the plan meets the requirements of Rule 10b5-1(c), Company Securities may be purchased or sold without regard to certain insider trading restrictions.

13. To comply with this Policy, a Rule 10b5-1 Plan must be approved by the Compliance Officer and meet the requirements of Rule 10b5-1(c). A Rule 10b5-1 Plan cannot be adopted during a quarterly Blackout Period or when the person entering into the plan is aware of material nonpublic information, and the first trade made pursuant to a Rule 10b5-1 Plan may not occur until after the "cooling-off period" following the date of adoption of the plan has expired, as set forth in Rule 10b5-1(c). For directors and officers, the "cooling-off period" expires at the later of (a) 90 days after the adoption of the Rule 10b5-1 Plan or (b) two business days following the disclosure of the Company's financial results in a Form 10-Q or Form 10-K for the completed fiscal quarter in which the Rule 10b5-1 Plan was adopted that discloses the Company's financial results (but, in any event, this required cooling-off period is subject to a maximum of 120 days after adoption of the Rule 10b5-1 Plan). For all other persons subject to this Policy, the "cooling-off period" expires 30 days after the adoption of the Rule 10b5-1 Plan. The plan must either specify the amount, pricing and timing of transactions in advance or delegate discretion on these matters to an independent third party and once the plan is adopted, the person must not exercise any influence over the amount of securities to be traded, the price at which they are to be traded or the date of the trade. Further, no person subject to this Policy may enter into or maintain more than one simultaneous Rule 10b5-1 Plan, except that a person may, in addition to one Rule 10b5-1 Plan to purchase or sell Company Securities on the open market, enter into or maintain a Rule 10b5-1 Plan that provides only for eligible sell-to-cover transactions solely to satisfy statutory tax withholding obligations arising exclusively from the vesting of compensatory awards, such as restricted stock units, and the person does not otherwise exercise control over the timing of such sales (an "<u>Eligible Sell-to-Cover Plan</u>"). Additionally, no person subject to this Policy may enter into more than one Rule 10b5-1 Plan in a 12-month period designed to effect a single open-market purchase or sale of all the securities covered by such plan (other than an Eligible Sell-to-Cover Plan).

Rule 10b5-1 Plans will be considered by the Compliance Officer on a case-by-case basis. Any Rule 10b5-1 Plan must be submitted to the Compliance Officer for approval at least five days prior to the entry into the Rule 10b5-1 Plan. No further pre-approval of transactions conducted pursuant to an approved Rule 10b5-1 Plan will be required.

14. <u>Trading Window and Pre-Clearance Procedures</u>. To help prevent inadvertent violations of the federal securities laws and to avoid even the appearance of trading on the basis of inside information, the Board has adopted an Addendum to this Policy that applies to directors, executive officers subject to Section 16 of the Exchange Act and other designated persons who have regular access to material nonpublic information about the Company. The Company will notify those individuals who are subject to the Addendum.

The Addendum generally prohibits persons and entities covered by it from trading in Company Securities, except during the trading windows specified in the Addendum. Directors, Section 16 executive officers and other designated persons also must pre-clear all transactions in Company Securities with the Compliance Officer.

In addition, from time to time, the Company may be involved in activities—such as proposed acquisitions—that are material and that are known only by a few people at the Company. For those individuals whose duties at the Company cause them to be aware of such activity, the Compliance Officer will notify them of an event-specific trading restriction and these individuals will not be permitted to trade in Company Securities during such trading restriction. The existence of an event-specific trading restriction will not be widely announced and should not be communicated to anyone. Even if individuals are not notified of an event-specific trading restriction, they should not trade in Company Securities if they are aware of material nonpublic information.

15. <u>Post-Termination Transactions</u>. This Policy continues to apply to transactions in Company Securities even after termination of service to the Company. If an individual is in possession of material nonpublic information when his or her service terminates, that individual may not trade in

Company Securities until that information has become public or is no longer material.

16.  <u>Unauthorized Disclosure</u>. Maintaining the confidentiality of Company information is essential for competitive, security and other business reasons, as well as to comply with securities laws. Directors, officers and employees should treat all information they learn about the Company or its business plans in connection with their employment as confidential and proprietary to the Company. Inadvertent disclosure of confidential or inside information may expose the Company and individuals to significant risk of investigation and litigation.

The timing and nature of the Company's disclosure of material information to outsiders is subject to legal rules, the breach of which could result in substantial liability to individual directors, officers or employees, the Company and its management. Accordingly, it is important that responses to inquiries regarding the Company from the press, investment analysts or others in the financial community be made on the Company's behalf only through authorized individuals, as expressly identified by the Compliance Officer.

17.  <u>Consequences of Violations</u>. The purchase or sale of securities while aware of material nonpublic information, or the disclosure of material nonpublic information to others who then trade in the Company's Securities, is prohibited by U.S. federal and state laws. Insider trading violations are pursued vigorously by the SEC, U.S. Attorneys and state enforcement authorities as well as foreign regulatory authorities. Punishment for insider trading violations is severe and could include significant fines and imprisonment. While the regulatory authorities concentrate their efforts on the individuals who trade, or who tip inside information to others who trade, the federal securities laws also impose potential liability on companies and other "controlling persons" if they fail to take reasonable steps to prevent insider trading by company personnel.

In addition, an individual's failure to comply with this Policy may subject the individual to Company-imposed sanctions, including dismissal for cause, whether or not the employee's failure to comply results in a violation of law.

In addition to the formal sanctions summarized above, a violation of law, or even an SEC investigation that does not result in prosecution, can tarnish a person's reputation and irreparably damage a career.

18.    Company Assistance. Any person who has a question about this Policy or its application to any proposed transaction may obtain additional guidance from the Compliance Officer, who can be reached by telephone at 704.572.6801 or by email at scanning@hayward.com.

**ADDENDUM TO INSIDER TRADING POLICY**

The Company has established additional procedures to assist in the administration of the Insider Trading Policy, to facilitate compliance with laws prohibiting insider trading while in possession of material nonpublic information and to avoid the appearance of any impropriety. These additional procedures are applicable only to directors and executive officers subject to Section 16 of the Exchange Act ("Section 16 executive officers") and other persons who are periodically designated by the Compliance Officer, or his or her designee, as being subject to these additional procedures (as well as their family members, household members and entities whose transactions are subject to the Insider Trading Policy). The Compliance Officer will notify those individuals who are subject to this Addendum.

In all cases, the responsibility for determining whether an individual is in possession of material nonpublic information rests with that individual, and any action on the part of the Company, the Compliance Officer or any other employee or director pursuant to the Insider Trading Policy, including this Addendum (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws.

1.    Pre-Clearance Procedures. Directors, Section 16 executive officers and other persons designated as being subject to this Addendum by the Compliance Officer or his or her designee (as well as their family members, household members and entities whose transactions are subject to the Insider Trading Policy) may not engage in any transaction in Company Securities at any time (other than as specified by the Insider Trading Policy, including this Addendum), even if not subject to a Blackout Period, without first obtaining pre-clearance of the transaction from the Compliance Officer. A request for pre-clearance should be submitted to the Compliance Officer at least two trading days in

27

advance of the proposed transaction. The Compliance Officer is under no obligation to approve a transaction submitted for pre-clearance and may determine not to permit the transaction. If a person seeks pre-clearance and permission to engage in the transaction is denied, then he or she should refrain from initiating any transaction in Company Securities and should not inform any other person of the restriction.

2.      When a request for pre-clearance is made, the requestor should carefully consider whether he or she may be aware of any material non-public information about the Company and should describe fully those circumstances to the Compliance Officer. The requestor should also indicate whether he or she has effected any non-exempt "opposite-way" transactions within the past six months and should be prepared to report the proposed transaction on an appropriate Form 4 or Form 5, if applicable. The requestor should also be prepared to comply with Rule 144 under the Securities Act of 1933, as amended, and file a Form 144, if necessary, at the time of any sale. After receiving clearance to engage in a trade from the Compliance Officer, the requestor must complete the proposed trade within two trading days or make a new trading request; provided, however, that if the requestor becomes aware of material nonpublic information before the trade is executed, the preclearance is void and the trade must not be completed.

3.      <u>Quarterly Trading Restrictions</u>. Directors, Section 16 executive officers and other persons who are designated by the Compliance Officer or his or her designee as being subject to this Addendum (as well as their family members, household members and entities whose transactions are subject to the Insider Trading Policy) may not engage in any transaction in Company Securities (other than as specified by the Insider Trading Policy, including this Addendum) during a "<u>Blackout Period</u>" beginning two weeks prior to the end of each fiscal quarter and ending after the second full trading day following the date of the public release of the Company's earnings results for that quarter. In other words, these persons may only conduct transactions in Company Securities during the "<u>Window Period</u>" beginning on the day after the second full trading day following the public release of the Company's quarterly earnings and ending two weeks prior to the close of the next fiscal quarter. For example, assuming a regular five-business day week, if the earnings release is published on Wednesday, trading may begin on the following Friday and continue until two weeks prior to the end of the fiscal quarter, assuming no event-specific trading restrictions are implemented.

4.    <u>Event-Specific Trading Restrictions</u>. From time to time, an event may occur that is material to the Company and is known by only a few directors, executive officers and/or employees. So long as the event remains material and nonpublic, such persons as designated by the Compliance Officer or his or her designee may not trade Company Securities. In addition, the Company's financial results may be sufficiently material in a particular fiscal quarter that, in the judgment of the Compliance Officer, designated persons should refrain from trading in Company Securities prior to the commencement of the Blackout Period. In that situation, the Compliance Officer may notify these persons that they should not trade in the Company's Securities without disclosing the reason for the restriction. The existence of an event-specific trading restriction period or extension of a Blackout Period will not be announced to the Company as a whole and should not be communicated to any other person. Even if the Compliance Officer has not designated you as a person who should not trade due to an event-specific trading restriction, you should not trade while aware of material nonpublic information.

5.    <u>Exceptions</u>. The quarterly trading restrictions and event-specific trading restrictions described above do not apply to those transactions to which the Insider Trading Policy does not apply, as described in the Insider Trading Policy under the headings "Transactions Under Company Plans," "Transactions in Mutual Funds" and "Transactions with the Company." Further, the requirement for pre-clearance, the quarterly trading restrictions and event-specific trading restrictions do not apply to transactions conducted pursuant to approved Rule 10b5-1 Plans, described in the Insider Trading Policy under the heading "Rule 10b5-1 Plans."

6.    <u>Notifying the Compliance Officer of Modification or Termination of Non-Rule 10b5-1 Trading Arrangements</u>. The Company is required to disclose in its quarterly reports on Form 10-Q and its annual reports on Form 10-K, the adoption, modification or termination by a director or Section 16 executive officer of any Rule 10b5-1 Plan and any "non-Rule 10b5-1 trading arrangement," which is defined as any written arrangement for the trading of securities that was entered into at a time when the director or Section 16 executive officer was not aware of material nonpublic information and (i) specified the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold, or (ii) included a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and

the price at which and the date on which the securities were to be purchased or sold, or (iii) did not permit the covered person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the trading arrangement, did exercise such influence must not have been aware of material nonpublic information when doing so. While the adoption or modification of a non-Rule 10b5-1 trading arrangement by a director or Section 16 executive officer is subject to the pre-clearance procedures set forth above, to assist the Company with its disclosure obligation, directors and Section 16 executive officers must promptly notify (within two business days) the Compliance Officer of any termination of a non-Rule 10b5-1 trading arrangement.

## SUBSTANTIVE ALLEGATIONS

### CONFIDENTIAL WITNESSES PROVIDE FACTUAL BASIS FOR ESTABLISHING FALSITY OF STATEMENTS ISSUED BY HAYWARD'S OFFICERS AND DIRECTORS

54.     Haywards sales depend on distributors' desire to hold inventory and ability to sell to consumers.

55.     For their part, distributors, who made up the bulk of Hayward's direct customers, responded to the surge in end-user demand and tight supply chain in FY 2020 by loading up their inventory of pool products during later in 2020 and the first half of 2021. But as end user demand waned after the peak of COVID, distributor demand dropped significantly.

56.     Nonetheless, Hayward's manufacturing skyrocketed and Hayward pressed that product into the distribution channel until in early 2022 that Channel was overstuffed.

57.     Net sales increased 96% YoY to $334.4 million for the first quarter of 2021 and increased 66% YoY to $364.4 million for the second quarter of 2021 as distributors loaded up on inventory. These results in the first half of 2021 continued to reflect the bubble of demand from the start of the pandemic.

58.     Multiple CWs confirmed that prior to the Relevant Period, by mid-2021, the channel's inventory levels had recovered, and the channel had already purchased and generally

had on hand more than sufficient inventory to meet downstream demand – in the short and long term. As set forth below by year end 2021, the channel had two years' worth of inventory, or up to $150 million of excess product.

59.     The channel's saturated inventory level caused a significant drop in channel demand, and difficulties for Hayward selling to the channel.  CW1 worked at Hayward from 2016 to December 2022 as a Senior Product Marketing Manager. CW1's job responsibilities included generating marketing materials and CW1's role involved a significant amount of "working between the product management and sales teams" at Hayward. By the time CW1 left Hayward, CW1 was in a reporting line one level removed from the Company's VP of Marketing and Product Management. Over the course of CW1's time at Hayward, CW1 worked in the Company's offices in New Jersey and in North Carolina.

60.     Starting in mid-2021, CW1 recalled that demand began to slow, and CW1 remembered hearing that "the channel was stuffed" and there were concerns about inventory. CW1 recalled that concerns about excess inventory were general knowledge around the Company and were "water cooler talk."

61.     CW2 worked in sales at Hayward from January 2016 to September 2022 and was a District Sales Manager from November 2020 to September 2022. CW2 worked in California and oversaw all of Northern California, from the greater Sacramento area to Reno, Nevada, all the way up to Oregon, Washington, Idaho, and the west end of Montana. CW2's job entailed working with distributors to purchase products from Hayward and get equipment out into the marketplace.  CW2 began to hear about excess inventory at distributors in May 2021. CW2 heard directly from distributors in 2021 that they simply had too much inventory already, about two years' worth, and they were not going to load up on any additional product.

31

62.    CW2 also learned in the course of CW2's duties that during Covid, distributors were told by Hayward to stock up because of supply chain issues. That is, during 2021, Hayward was telling distributors to purchase more inventory than they needed, to ensure they had inventory in future periods.

63.    CW2 recalled that the overages in distributor inventory were often brought up among colleagues. CW2 noted that "everyone discussed it." CW2 was also convinced that CSuite executives like the CEO would have known that distributors had enough inventory based on the large increase in purchases the previous year, followed by limited early buy orders in 2021 (further discussed below).

64.    CW2, who currently works for one of the large pool products distributors that is a customer of Hayward, learned that post-Covid, CW2's current employer at one point had about two-and-a-half years' worth of Hayward products. CW2 also made clear to his superiors that this distributor had too much inventory "at the time" that Hayward was experiencing the problems with reduced demand and excess channel inventory that CW2 discussed above and as detailed herein.

65.    CW3 was a Senior Business Intelligence Visualization Developer at Hayward from August 2021 to March 2023. CW3 reported to the Vice President of Analytics and also worked with Hayward's then-VP of Sales and its then-Chief Supply Chain Officer. Further, as part of CW3's job duties, CW3 was asked to put several reports together for Defendant Jones, and CW3 also oversaw centralizing Hayward data into one reporting tool named Snowflake. 70. Similar to CW2, CW3 came to understand that due to delays in the supply chain, distributors began to place orders double the size of their typical orders. That is, after ordering the inventory they needed for the upcoming period, distributors would place an additional order for inventory

they needed in the next period before the first set of orders even arrived. As a result, CW3 concluded that Hayward's "demand was increasing" during that time. However, almost from the moment CW3 started working at Hayward in August 2021, Hayward's then-Chief Supply Officer was concerned with this large bubble of orders that was occurring in 2021. CW3 saw that this ordering was occurring through mid-2021, around the time that the Ever-Given container ship was stuck in the Suez Canal – the ship resumed moving in early July 2021 – but that later in 2021 the supply chain bubble, or bottleneck, popped.

66.    At the end of the Relevant Period, Defendants Holleran and Jones admitted that the channel was loading up on safety stock early in 2021 and that it was oversaturated with inventory, confirming the CWs' statements set forth above. In the July 28, 2022 2Q-2022 earnings call, Defendant Jones acknowledged that "[d]istributors started reducing safety stocks as a result of improved supply chain and shorter lead times for specific products." Similarly, in the same call, Defendant Holleran stated that "[w]ith distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory." Likewise, in the November 1, 2022 3Q-2022 earnings call, Defendant Holleran stated "[d]istributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption, and we estimate a reduction of approximately $80 million occurred in the third quarter and compared to a meaningful inventory build in the prior year period."

67.    In July 2022, Defendants Holleran admitted that in 2021 Hayward knew that distributor demand was dropping, confirming the CWs' statements set forth above. As he admitted after the fact on the July 28, 2022, 2Q-2022 earnings call (discussed further below),

33

"[w]e expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021." He further admitted that "[o]verall, when we set coming into the year, with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year."

68.     Instead, distributors began cancelling orders because they already had too much inventory. Defendants tracked these circumstances.  CW3, a Senior Business Intelligence Visualization Developer, was aware of customer cancellations because of the reports CW3 was tasked with running in CW3's role. CW3 believed cancellations, and a lack of new orders, began around March 2022. CW3 learned during the course of CW3's duties that in early 2022, around the end of February, Defendant Jones began to ask for cancellation reports to be put together so he could access them. CW3 published these reports on a Tableau dashboard that Jones could review (Tableau is a visual analytics platform). CW3 also prepared reports for Defendant Jones to visualize inventory backlog and how much money was tied up in products that were made but not being distributed. CW3 recalled, as an example, that there was a special order for heaters that someone required and then cancelled, and stated "[t]hat ended up being $11 million of inventory," which Hayward "was stuck with just from one order."

69.     As CW3 explained, Hayward was getting "hammered" by distributors who placed orders but then no longer wanted those orders anymore. CW3 learned during the course of CW3's duties that, after the supply chain bubble popped, Hayward was producing and sending product out, but that distributors then had enough product on hand without increased customer orders, so the distributors began cancelling orders. Vendors and distributors became overwhelmed with the product they already had, and "[e]veryone was like, I don't have room for all this stuff," CW3 recalled. 97. Consistent with CW3's statements, as set forth herein, CW4

recalled orders rejected by customers, and CW6 recalled "talks" of large-scale returns of Hayward orders.

70.    CW6 recalled that "all the evidence was there" for people at Hayward to see that the channel was full. To that point, CW6 clarified that "product managers . . . anyone in operations management . . . and management definitely would have known." CW6 also recalled "talks" of large-scale returns of Hayward orders.

71.    Additionally, with regard to the channel being full, CW6 stated that "if C-Suite did not know about it, it was gross incompetence . . . they had to know." CW6 remembered that Hayward had monthly Sales, Inventory and Operations Planning meetings, which CW6 attended along with 40 to 60 managers representing every section of Hayward, and which lasted two or three hours. CW6 recalled that these meetings were chaired by Defendant Holleran and attended by Defendant Jones. CW6 recounted that these meetings discussed forecasting and sales, including "what's selling good, what's not selling good."

72.    Thus, whatever issues may have existed with Hayward's supply chain, those issues and Hayward's ability to procure materials and manufacture products were not stopping it from meeting channel demand. Hayward had more than sufficient products to sell but lacked enough channel demand to do so.

**Defendants' False Statements Keep Hayward**
**Stock Price Inflated While Insiders Sell in 2022**

73.    Unable to stop the problems set forth above which were impairing Hayward's performance, Defendants Hayward, Holleran and Jones made a series of false statements and material omissions during the Relevant Period, as detailed below. They thereby created the false and misleading impression that, among other things, channel inventory was not elevated, channel demand was not stalling, and Hayward's businesses remained strong.

74.     Meanwhile, under cover of the material misrepresentations and omissions, multiple insiders who comprised the bulk of Hayward's senior leadership sold an enormous amount of Hayward stock under unusual circumstances and at artificially inflated prices, as detailed below. It totaled nearly $558 million, with nearly $150 million in illicit profits, across six insiders. These insider sales were made by two of Hayward's three sponsors, along with four of Hayward's five most senior officers, and included several Defendants.

75.     In addition, Hayward's other top five officer, CSO Don Smith, who had predated the Control Defendants' acquisition of Hayward and expressed concern regarding the channel's elevated inventory and Hayward's own ballooning inventory, resigned in the middle of the Relevant Period.

**After Insiders Sold**

76.     On July 28, 2022, Defendants Hayward, Holleran and Jones finally admitted that, as they had long known and the CWs described, Hayward was suffering from "elevated channel inventories" and significant "reductions in channel inventory." They later revealed that channel was reducing an enormous "120 million to $150 million" of Hayward products from its inventory. As a result, Hayward conceded that its nets sales for FY 2022 would decline by about 6% as compared to 2021, a far cry from the sustained demand and growth Defendants Holleran and Jones had been touting during the Relevant Period.

77.     Although the Company suffered enormous losses as the truth emerged, Defendants made millions of dollars by unloading Hayward stock when it was still artificially inflated.

**False and Misleading Statements From Late 2021 through July 2022**

78.     From late 2021 through July 2022, in earnings calls, press releases, presentations, and SEC filings, Defendants Hayward, Holleran and Jones made materially false and misleading statements and omissions that misrepresented and/or concealed from investors that: (i) channel inventory was overly elevated; (ii) channel demand was almost nonexistent; (iii) by late 2021, Hayward was having difficulty selling to the channel and was resorting to tactics like discounts, pull ahead and threats to prop up sales; (iv) Hayward was suffering from significant order cancellations and returns were hammering Hayward; and (v) information Hayward received from the channel in early 2021 directly contradicted the FY 2022 guidance Hayward provided to investors.

79.     Hayward issued a press release on October 27, 2021 ("October 2021 Press Release"), in connection with the earnings call that day and its 3Q-2021 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, that was filed the same day.

80.     The October 2021 Press Release reported financial results for 3Q-2021, including that Hayward had net sales of $350.6 million, representing a 56% year-over-year net sales increase, and an Adjusted EBITDA of $98.3 million, representing a 61% year-over-year increase. It also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran during the conference call the same day.

81.     First, Hayward's October 2021 Press Release made false and misleading statements denying that demand was stalling. It claimed that the Company's "current demand levels and Hayward's production capabilities remain strong." 134. The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs,

Hayward's demand had not "remained strong." In truth, demand in the channel, which made up 76% of Hayward's sales, had been stalling since mid-2021, with the oversaturated channel informing Hayward that it did not need additional products. This was causing Hayward to miss its sales targets, and management to resort to discounting and other sales tactics just to try to prop up sales. Moreover, Hayward's claim created the false and misleading impression that it had to maintain high "production" levels to meet the strong demand for its products. In truth, as set forth above and described by CWs, Hayward's had been concerned by the Company's excessive production level, which was far outstripping demand and causing Hayward's own inventory to balloon with products it was unable to sell. Thus, by late 2021, Hayward management was directing its production to slow down, reflecting stalling demand.

82.    Second, the October 2021 Press Release also quoted a false and misleading statement from Defendant Holleran denying that channel demand was stalling and that Hayward had resorted to actively propping up its sales. It quoted Defendant Holleran as claiming,"[o]ur third quarter results were driven by our team's ability to execute and capture the sustained demand for Hayward products as we continue to see strength in the pool market."

83.    The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward's 3Q-2021 results were not driven by "sustained demand," rather, with channel demand stalling and Hayward missing sales targets since mid-2021, Hayward had been substantially manufacturing its sales results with a management-driven campaign to "get products off the shelves" that included discounts, sales blitzes, and pressure tactics. C. October 27, 2021: Hayward's Form 10-Q for 3Q-2021 137. On October 27, 2021, Hayward filed its Form 10-Q for 3Q-2021, which also contained its financial results for the

quarter, as well as actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran during the conference call and Press Release the same day.

84.    First, in the Form 10-Q for 3Q-2021 Hayward made false and misleading statements denying that channel demand was stalling and that it had resorted to actively propping up its sales. Hayward claimed, for example, that its net sales results for 3Q-2021 in North America were "mostly due to higher sales of residential pool equipment as demand for more efficient, environmentally friendly and automated pool products remains robust," and made other substantially similar claims as well.

85.    The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward's 3Q-2021 results were not driven by "demand" that "remains robust." To the contrary, demand from the oversaturated channel, which made up 76% of Hayward's sales, had been stalling and Hayward had been missing sales targets since mid-2021, and Hayward's management resorted to a campaign to "get products off the shelves" that included discounts, sales blitzes, and pressure tactics, which substantially accounted for and propped up the Company's 3Q-2021 sales.

**Repurchase Program**

86.    Hayward issued a Press Release on December 20, 2021, when its 4Q-2021 results were close to final ("December 2021 Press Release"). That Press Release was also included in a Form 8-K, signed by Defendant Jones and filed the next day.

87.    The December 2021 Press Release announced a $450 million stock repurchase program, that included Hayward repurchasing 4.08 million shares from its sponsors, later revealed to be CCMP and its client and minority partner defendant AIMCo. The Press Release also contained actionable statements and omissions.

88.     First, the December 2021 Press Release contained a false and misleading quote from Defendant Holleran denying that Hayward's business and growth were impaired, owing to stalling channel demand, and denying that the repurchase program was designed for the CCMP Entities and their client and minority partner AIMCo to sell a large amount of stock at artificially inflated prices. The Press Release quoted Holleran as claiming that Hayward undertook the repurchase program because "[o]ur business is performing well and we remain confident in our ability to continue executing our growth initiatives in the years ahead."

89.     The claim in the preceding paragraph was false and misleading, for, as detailed above and described by CWs, Hayward's "growth initiatives" were exhausted and its business "perform[ance]" was impaired by stalling demand from the channel, which made up 76% of Hayward's sales. Following a bubble of high demand and growth at the start of the pandemic, the channel was already oversaturated with two years of inventory by mid-2021, which resulted in the channel reducing its demand and Hayward management resorting to a campaign of discounts, sales blitzes, and other pressure tactics to try to prop up growth, which simply cannibalized future revenue. As such, Hayward management was then seeking to shrink the Company's production output, to match reduced demand and performance. The repurchase program simply enabled the CCMP Entities and their client and minority partner AIMCo to unload a substantial amount of stock before the facts set forth above emerged, as part of a large wave of stock sales during the Relevant Period by insiders and Hayward's senior leadership.

90.     In addition, the December 2021 Press Release contained a false and misleading quote from Defendant Jones that made similar denials as the statement discussed in the preceding paragraph. It quoted Defendant Jones as claiming that the repurchase program was undertaken due to and reflected Hayward's "strong cash flow generation capability."

40

91.     For the reasons set forth above, the claim in the preceding paragraph was false and misleading: Hayward's business was saddled with an oversaturated channel, declining demand, discounted sales, excess production, and its own ballooning inventory, all of which substantially undercut its "cash flow generation capability," and the repurchase program allowed insiders to sell large amounts of stock before that truth fully emerged.

**Preliminary 1Q-2021 Results**

92.     A January 2022 Press Release announced Hayward's preliminary results for 4Q2021 and gave a brief update on the previously announced repurchase program. It contained actionable statements and omissions as well.

93.     First, in the January 2022 Press Release, Hayward made false and misleading statements denying that channel demand was stalling and that Hayward had resorted to actively propping up its sales. Hayward claimed that the 4Q-2021 net sales and growth it announced primarily occurred because "we continued to see demand from aftermarket upgrades and new construction."

94.     The claim in the preceding paragraph was actually false and misleading because, as set forth above and described by CWs, Hayward's 4Q-2021 results were not driven by "continued" demand. In truth, demand from the oversaturated channel, which made up 76% of Hayward's sales, had been stalling and Hayward had been missing sales targets since mid-2021. Hayward's management had therefore resorted to manufacturing results with a campaign to "get products off the shelves" that included discounts, pull aheads, sales blitzes, and pressure tactics, all of which cannibalized future revenue, an outcome that management was willing to accept to hit its targets. This substantially accounted for and propped up the Company's 4Q-2021 net sales growth.

95.     In the January 2022 Press Release, Hayward made additional statements denying that channel demand was stalling and the Company's production was far outstripping demand. Hayward claimed that its sales growth "continues to benefit from the demand environment for outdoor living products" and from "our production capabilities," which enable it to meet that demand.

96.     The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward management was then attempting to reduce its production levels to bring them into line with the stalling channel demand.

**Final 4Q-2021 and FY 2021 Results**

97.     Hayward issued a press release on March 2, 2022 ("March 2022 Press Release"), in connection with the earnings call that day and its final 4Q-2021 and FY 2021 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, and filed the same day.

98.      The March 2022 Press Release reported 4Q-2021 net sales of $352.4 million representing 35% YoY growth and Adjusted EBITDA of $105.7 million representing a 43% YoY growth, which were in line with the preliminary numbers announced in January 2022. It also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran and Defendant Jones during the conference call the same day.

99.     First, the March 2022 Press Release contained false and misleading statements denying that demand was stalling. It quoted Defendant Holleran as claiming that he "saw a continuation of robust organic growth in net sales," and that the Company was "entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels supported by both new construction and aftermarket activity . . . ."

100.    The claim in the preceding paragraph was false and misleading, because, as set forth above, rather than a "continuation of robust organic growth in net sales," Hayward was then resorting to discounts, pull aheads and similar tactics to prop up its sales, owing to the fact that the oversaturated channel's "demand levels" were dropping.

101.    The March 2022 Press Release also contained false and misleading statements denying that channel demand was stalling and the actual source of the Company's performance. Hayward claimed that its increase in net sales for 4Q-2021 was "primarily" due to "continued demand in residential pool equipment sales," and stated that "[n]et sales growth continues to benefit from a robust demand environment for outdoor living products" as well as from the "increased capacity and capabilities leading to higher output" of Hayward's production.

102.    The claim in the preceding paragraph was false and misleading, because, as set forth above, Hayward's 4Q-2021 nets sales substantially resulted from its campaign of discounting, pull aheads and similar tactics, not from "robust demand." Moreover, given that channel demand was then dropping, Hayward's management had actually directed a reduction in its production "output," as its own inventory was ballooning with unsold products.

103.    Second, the March 2022 Press Release contained actionable statements and omissions regarding the FY 2022 guidance. In particular, Hayward reiterated that guidance and claimed that the Company is "well positioned to deliver continued net sales and adjusted EBITDA growth in 2022 following the tremendous success in 2021 given the sustainable secular trends driving demand for pool products."

104.    The FY 2022 guidance was false and misleading for the reasons set forth above. Likewise, the claim in the preceding paragraph that Hayward was then "well positioned" for

growth in 2022 was false and misleading because, as set forth above, it was actually set for a reduction of volume in 2022 due to "demand" that was decreasing and not "sustainable."

**Form 10-K for FY 2021**

105.    On March 9, 2022, Hayward filed its Form 10-K for FY 2021. The 10-K for FY 2021 was signed by Defendants Holleran, Jones, Afraz, Bertrand, Brenneman, Brown, Dayhoff, McFadden, Felice, Peters, Silber, Soucy, Walker, Walsh and Ward.

106.    The 10-K for FY 2021 contained Hayward's financial results for FY 2021. Further, it contained actionable statements and omissions reinforcing and echoing several of those made during the March 2, 2022, earnings call and in Hayward's March 2022 Press Release.

107.    First, the 10-K for FY 2021 made false and misleading statements denying that demand was stalling and the actual source of its net sales. Thus, Hayward claimed that, for FY 2021, "[t]he increase in net sales was primarily the result of higher volumes, mainly in residential pool equipment sales from continued demand for pool upgrades and increasing new pool construction . . . ." Hayward likewise attributed its increase in net sales in North America primarily to "demand" that "remained robust," and its increase in net sales in Europe primarily to "continuing strong customer demand. . . ."

108.    The statements in the preceding paragraph were false and misleading, because, as set forth above, Hayward's net sales in FY 2021, especially by the second half of the year, resulted from its campaign of discounting, pull aheads and similar tactics, owing to the fact that demand in the channel that made up 76% of its sales was stalling, and was not "robust" or "continu[ing]."

**The 2022 Proxy Statement**

109.    The 2022 proxy statement was issued by order of the board of directors which included all of the directors who signed the 10-K filed on March 9 2022.  The director defendants, eight of whom are still directors, solicited shareholder vote using a materially misleading proxy.

**1Q-2022 Results**

110.    Hayward issued a press release on April 28, 2022 ("April 2022 Press Release"), in connection with the earnings call that day and its 1Q-2022 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, that was filed the same day. 219. The April 2022 Press Release reported Hayward's results for 1Q-2022 and also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran and Defendant Jones during the conference call the same day. 220. First, the April 2022 Press Release contained false and misleading statements denying that channel demand was stalling and the source of its actual performance. Hayward claimed that "[n]et sales continue to be driven by trends in aftermarket upgrades and consumer investments in outdoor living spaces," and that "[n]et sales growth during the quarter was the result of higher volumes driven by production capabilities."

111.    The claims in the preceding paragraph were false and misleading because, as set forth above, Hayward's net sales were then substantially "driven by" management's campaign of discounting, pull aheads and similar tactics to prop up net sales. Moreover, Hayward's management was directing a reduction in its "production," to bring it in line with stalling channel demand, and attempt to halt Hayward's ballooning inventory of unsold products.

112.    Second, in the April 2022 Press Release, Hayward reaffirmed its guidance for FY 2022. That was false and misleading for the reasons set forth above.

113.    Hayward also claimed in the April 2022 Press Release that it "remains well positioned to achieve net sales and adjusted EBITDA growth for the full year following the strong start in the first quarter of 2022," that "underlying market trends remain positive," and that both of those points support the FY 2022 guidance.

114.    The claims in the preceding paragraph were false and misleading because, as set forth above, Hayward was not at all "positioned to achieve net sales growth." Rather, its order volume was already set to shrink in 2022, because the actual "market trends," including a channel reducing its inventory and demand, were substantially negative, and Hayward had only managed growth in Q1-2022 through management's campaign of discounting, pull aheads and similar tactics that propped up sales by cannibalizing future revenue.

**Form 10-Q for 1Q-2022**

115.    On April 29, 2022, Hayward filed its Form 10-Q for Q1-2022, which contained its financial results for FY 2021, as well as actionable statements and omissions reinforcing and echoing several of those made during its April 28, 2022, conference call and in its April 2022 Press Release. The 10-Q for 1Q-2022 was signed by Defendant Jones. 226. First, the 10-Q for Q1-2021 made false and misleading statements denying that demand was stalling and the true source of its net sales. Hayward claimed that for the quarter its volume growth in net sales was mainly driven by demand for "new products."

116.    The claim in the preceding paragraph was false and misleading because, as set forth above, Hayward's net sales for the quarter substantially resulted from management's campaign of discounting, pull aheads and similar tactics, not from demand for new products.

**May 2 and 3, 2022 Registration Statement and Prospectuses**

117.    On May 2, 2022, in connection with an underwritten SPO initiated by the CCMP

Entities, Hayward filed several documents, including a Form S-3 Registration Statement ("Form

S-3"), which was signed by Defendants Holleran, Jones, McFadden, Walsh, Brenneman,

Betrand, and Brown. 230. Hayward's S-3 provided certain information regarding the SPO and

also contained actionable statements and omissions.

118.    First, the S-3 incorporated by reference Hayward's 10-K for 2021, and also its 10-

Q for 1Q-2022. Hayward's S-3 thereby incorporated the false and misleading statements in those

two documents, as set forth above.

119.    Second, the S-3 incorporated substantially similar risk warning as those discussed

above, and they were false and misleading for the reasons set forth above.

120.    In addition, on May 3, 2022, Hayward also filed a Prospectus Supplement in

connection with the SPO, which was updated on May 4, 2022 ("Prospectus Supplement").

Hayward's Prospectus Supplement incorporated the same statements from the S-3 noted in the

two preceding paragraphs, and those statements are false and misleading for the reasons set forth

above.

121.    The selling defendants dumped hundreds of millions of dollars of stock at inflated

prices to the public and to Hayward.

**July 28, 2022 Press Release and Earnings Call**

122.    On July 28, 2022, Defendants issued a press release (filed with a Form 8-K at

approximately 7:00 a.m. ET) and held a conference call at 9:00 a.m. ET in connection with their

2Q-2022 results. While Hayward's net sales and Adjusted EBITDA grew modestly YoY for the

quarter, the percentage increases were down compared to previous quarters: net sales for 2Q-

2022 increased 10% YoY, compared to 23% for 1Q-2022, 35% for 4Q-2021, and 56% for 3Q-2021. Moreover, the small 2Q-2022 increase in net sales year-over-year "was the result of favorable pricing and acquisitions, partially offset by lower volumes," as disclosed during the earnings call.

123.    Defendant Holleran was quoted in the press release as stating that given certain trends "and improving supply chain predictability, we expect our channel partners will reduce their Hayward inventory on hand by approximately 4 to 6 weeks in the second half of 2022." Accordingly, Defendant Holleran stated, "We are reducing our 2022 guidance to reflect this inventory reduction and are taking the appropriate actions to manage our production and costs to maintain our industry leading margins." The press release further stated that Hayward was "reducing its full fiscal year 2022 guidance to reflect its outlook for the expected channel inventory reduction in the second half of the year as well as continued impact of geopolitical events in Europe and unfavorable exchange rates."

124.    The reduction in Hayward's guidance was dramatic: Defendants went from guiding for an increase in sales for FY 2022 between 9% and 12% (which they had repeated in March and late April), to guiding for a decrease in sales between 2% and 6% for FY 2022. This sharp downward revision was also in stark contrast to earlier and recent statements made by Defendants, including that demand and growth drivers were strong, as set forth above. 254. On the earnings call, Defendant Holleran acknowledged that there were "elevated channel inventories at the end of Q2 2022," which "reduced the level of in-season restocking orders we would typically deliver in late second quarter and third quarter." He elaborated:

> With distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory. We are planning for reductions in channel inventory from over 4 months

of inventory on hand to closer to 3 months by the end of the year. We believe this will enable us and our channel partners to start 2023 with the right level and mix of product for the 2023 pool season.

As a result of this and the lower sales forecast for Europe, the company now anticipates a consolidated sales decline of 2% to 6% and adjusted EBITDA of $385 million to $400 million.

125.    Later in the call, Defendant Jones likewise stated that the destock would consist of "a takedown of 4 to 6 weeks" of inventory by the channel. He explained that "[t]he channel has the ability to hold between 4 to 4.5 [months] at the top end and can go down to 3 before it starts to feel short," and that Defendants had lowered "the channel inventory forecast down to the low end of the 3," estimating that the channel would have "around about 3.25 months on hand" after the four- to six-week destock was complete.

126.    When the Q&A portion of the conference call commenced, analysts expressed surprise. The first analyst asked:

So, I just really want to hit on the destock and just understand -- it seems like the magnitude is quite stark, particularly given that price is going through and what you had in the first half. So just kind of level set us on how you got comfortable with the level of declines? And do we -- it looks like Europe is a little more weak, do we hold flat for the year in North America? Or is that also negative?

In response, Defendant Holleran explained that "more than half of the new guidance is related to channel inventory."

127.    In response to another question about potential moderation in demand, Defendant Holleran again acknowledged that the current state of affairs was not unexpected for Hayward:

Overall, when we set coming into the year, with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year. And at the halfway point, I would say, while there's still growth clearly year-over-year, the volume has not quite been what we expected. Lots of price. There are some areas where mix is contributing to it, but that's kind of the equation there, price and a little bit of mix, but not quite on the volume side.

Defendant Jones added:

> As you think about the balance of the year, Jeff, I would say both regions will have a restocking recalibration program. It will be larger in North America. That's where the balance sheets were stronger for our channel partners. We probably saw some destocking in the first half in Europe, but there will still be further destocking. Both regions will take that correction in the second half. But the correction will be higher in North America than it will be in Europe.

In other words, Hayward expected destocking in both North America and Europe, with some previously unannounced destocking already having occurred in Europe in the first half of the year (though not all of it), such that the remaining "correction" would "be higher in North America than it will be in Europe."

128.    Defendant Holleran further admitted that the switch in guidance, while blindsiding analysts, was not unforeseen by Hayward. Expanding on earlier comment, that Hayward expected to sell less into the channel than channel sellout in 2022, he explained that this was "due to the strategic positions that many of our channel partners took at the end of 2021." That is, the channel had already informed Hayward it was reducing its inventory by later in 2021.

129.    The statements in the preceding paragraphs finally and fully disclosed that the channel was long saturated with inventory, that demand from the channel had consequently dropped significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. The channel destocking, which Defendant Holleran admitted Hayward knew of by later in 2021, was an integral part of and response to the channel's oversaturation of inventory and reduced demand, conditions that dated back to before the Relevant Period. That is, Hayward had already been expecting reduced channel demand and channel inventory destocking well before the July 28, 2022 disclosures. Defendants may have

been able to delay the impact of the channel's saturated inventory and reduced demand for a limited period of time—until after insiders had an opportunity to unload a large number of shares—with discounting, pull aheads and similar tactics, but they could not change the fundamental dynamics and actually harmed overall performance by further increasing channel inventory and cannibalizing future revenue.

130.    Also, though Defendants Holleran and Jones attempted to deflect these belated disclosures by claiming that macro factors like poor weather and events in Ukraine also played a role in Hayward's reduced guidance, when pressed they made clear that these purported factors were a sideshow. Defendant Jones candidly acknowledged on the call, "more than half of the reduction in the guidance of the top line is related to channel inventory reduction"—which is also consistent with the CWs' descriptions above.

131.    Analysts were not shy in expressing their surprise at the new guidance. On the earnings call, one analyst bluntly stated, "[s]o this guidance change is rather abrupt." The focus on the guidance change is also evident in an analysis performed by Credit Suisse after the quarter's results came out: Credit Suisse (which lowered its price target for Hayward shares by $3 or about 14.3%) stated, "[o]f more significance than the 2Q results, HAYW reduced its 2022 guidance for sales." Similarly, BMO Capital, which had previously given the shares a price target of $27.00 per share on March 2, 2022, slashed their price target for Hayward shares to $14.00—just over half of their most recent price target.

132.    After disclosing the foregoing information, the price of Hayward's common stock declined $2.50 per share, or 18.23%, from the previous day's close, to close on July 28, 2022, at $11.21 per share.

133.    As Defendants subsequently disclosed, the amount of the channel destocking, Hayward's reduced sales, and Hayward's own inventory overload were even greater than Defendants had indicated on July 28, 2022. 264.

134.    For example, in 3Q-2022, Hayward's net sales decreased 30% YoY, primarily driven by a 44% reduction in volume, and Defendant Jones explained that "the volume reductions we experienced compared to last year are due entirely to channel inventory movements." According to Defendant Holleran, "[d]istributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption, and we estimate a reduction of approximately $80 million occurred in the third quarter. . . compared to a meaningful inventory build in the prior year period." As a result, Hayward "now expect[ed] full year 2022 net sales to decline approximately 6%"—i.e., the bottom end of the revised guidance announced the prior quarter.

135.    Defendant Jones clarified that they expected the total channel inventory correction to be between "$120 million to $150 million" of Hayward products and that they were "kind of trending up in about midrange right now, $130 million to $135 million is the channel correction." As for Hayward's own inventory, Defendant Jones reported that it was still holding approximately six weeks of extra inventory.

136.    Hayward's poor performance and the channel inventory destocking continued thereafter.

## **INSIDER TRADING**

137.    Defendant Jones, Holleran, Roetken, the CCMP entities and AIMco (collectively "Insider Trading Defendants") all sold substantial amounts of stock monetarily and percentage of

holdings, collectively worth about $520,000,000, during the Relevant Period while in possession of material nonpublic information.

138.    The individual Insider Trading Defendants were highly motived to participate in the illicit insider stock sales, especially given how the Company's business philosophy puts a great emphasis on equity compensation.

139.    Pursuant to the 2025 Proxy under *Equity Compensation:*

> A significant portion of each named executive officer's compensation is in the form of equity compensation to create a strong alignment with the interests of stockholders. If the Company's stock price declines, so does the value of the NEOs' compensation, and vice versa.

### A.    Individual Insider Trading Defendants

140.    Defendant Jones engaged in improper insider sales while in possession of material non-public information about the Company, selling 189,945 Hayward shares for proceeds of $3,292,353.

141.    Had these shares been sold on July 28, 2022, the close of the Relevant Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $2,129,283. Therefore, Jones gained $1,170,717 in illicit profits as result of his sales. Thus, Jones had an incentive to inflate Hayward's stock price through issuing and allowing false and misleading statements regarding Hayward's inventory and Distributor demand in order to profit from insider sales. Through material omissions and misrepresentations to the market about the status of Distributor demand and inventory and the related impact on Hayward's financials, Jones sold Hayward stock at artificially inflated prices, reaping a material personal benefit not shared with other Hayward stockholders from the misconduct pled herein.

142. Defendant Holleran engaged in improper insider sales while in possession of material non-public information about the Company, selling 50,272 Hayward shares for proceeds of $1.18 million.

143. Had these shares been sold on July 28, 2022, the close of the Relevant Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $564,549. Therefore, Holleran gained $615,451 in illicit profits as result of his sales.

144. Thus, Holleran had an incentive to inflate Hayward's stock price through issuing and allowing false and misleading statements regarding Hayward's inventory and Distributor demand in order to profit from insider sales. Through material omissions and misrepresentations to the market about the status of Distributor demand and inventory and the related impact on Hayward's financials, Jones sold Hayward stock at artificially inflated prices, reaping a material personal benefit not shared with other Hayward stockholders from the misconduct pled herein.

145. Defendant Roetken engaged in improper insider sales while in possession of material non-public information about the Company, selling 353,195 Hayward shares for proceeds of $ $8.72 million.  This sale amounted to 68.15% percent of his holdings at the start of and acquired during the Relevant Period.

146. Had these shares been sold on July 28, 2022, the close of the Relevant Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $3,959,315. Therefore, Roetken gained $4,760,685 in illicit profits as result of his sales.

147. Thus, Roetken had an incentive to inflate Hayward's stock price through issuing and allowing false and misleading statements regarding Hayward's inventory and Distributor

54

demand in order to profit from insider sales. Through material omissions and misrepresentations to the market about the status of Distributor demand and inventory and the related impact on Hayward's financials, Jones sold Hayward stock at artificially inflated prices, reaping a material personal benefit not shared with other Hayward stockholders from the misconduct pled herein.

### B.  Entity Insider Trading Defendants

148.    CMP Entities sold a total of 24,456,876 Hayward shares, which amounted to 34.19% of their holdings, thereby securing $379,634,831.48 in proceeds. Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $274,161,580. Therefore, the CCMP Entities gained $105,473,251 in illicit profits as result of their sales.

149.    AIMCo sold a total of 11,048,123 shares, for $161,585,655.64 in proceeds. Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $123,849,459. Therefore, AIMCo gained $37,736,185 in illicit profits as result of its sales.

### THE RULINGS IN THE SECURITIES
### CLASS ACTION CORROBORATE THE ALLEGATIONS HERE

150.    On June 4, 2025, Hon. William J. Martini, U.S.D.J., presiding over the Securities Class Action, granted in part and denied in part, three separate motions to dismiss brought by three separate groups of defendants: a group consisting of the Company and two executives, one of whom is named here (Holleran); a group consisting of institutional major shareholders in Hayward and their principles, one of whom, Brown, is named as a defendant; and the third group being a second institutional investor, all of whose principals were at one time directors of Hayward and are named here.

151.    The Class Action Amended Complaint alleged that during the Relevant Period, October 27, 2021 to July 28, 2022, Hayward and Holleran made a series of materially false and misleading statements which concealed that Hayward's products were not selling; that distributor's orders to Hayward were dropping significantly; and its unsold inventory was forced onto distributors thus saturating the channel with unsalable product; and Hayward was manufacturing product far in excess of any conceivable demand. The misrepresentations appeared in, *inter alia*, Hayward's third quarter (ended September 30, 2021), Report on Form 10-Q ("Q-3 10Q"); a January 24, 2022 Press Release; the 2021 Form 10-K issued in early 2022 and signed by eight directors of the current nine member board; on April 28, 2022 press release; the Quarterly Report on Form 10Q for the first quarter of 2022 ("Q-1 10Q"); the May 2, 2022 Form S-3 ASR; Free Writing Prospectus and Prospectus Supplement.

152.    The materially false and misleading 10-K was signed by defendants Holleran, Jones, Afraz, Bertrand, Brenneman, Brown, Dayhoff, Felice, McFadden, Peters, Silber, Soucy, Walker and Walsh.

153.    All of the entity defendants and director defendants named herein were direct or indirect partners to the Underwriting Agreement's Lock Up Agreement attachment for the May 2022 public offering of, *inter alia*, 15,519,193 shares by CCMP Capital Advisers M.P. and 8,480,807 shares by Alberta Investment Management Corp. As part of this offering, the director defendants obligated Hayward to repurchase 8,000,000 of its own shares at inflated prices.

154.    As set forth above, sales by insiders were: defendant CCMP sold 2.7 million shares in a block trade on July 24, 2022 at $19.80 per share.

155.    Defendant AIMco sold 1.4 million shares on January 24, 2024 at $19.80 per share.

156.    On March 11, 2022, the entity defendants caused Hayward to repurchase 4.08 million shares from CCMP at $19.80 per share, despite a market price that day of $16.80. Other repurchases made under that program were made at lower market prices.

157.    Significantly, the Court refused to dismiss the controlling shareholder claims against MSD and CCMP based in large part on their own admissions in Relevant Period SEC filings that they asserted "collective control" over Haywood and that CCMP and MSD had an agreement to coordinate the voting of their 76% interest "with respect to timing and manner of disposition" of Hayward stock.

158.    The District Judge also denied the CCMP and MSD affiliated individual defendants' motion to dismiss and held that their "control" of Hayward was well pleaded.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

159.    Plaintiff brings this action derivatively in the right and for the benefit of Hayward to redress injuries suffered, and to be suffered, by Hayward as a direct result of violations of federal securities laws by the Defendants. Hayward is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.    The Board of Hayward, at the time this action was commenced, consisted of nine directors.  Out of these nine directors, eight are defendants.  These eight defendant directors include (1) Kevin Holleran, (2) Stephen J. Felice. (3) Kevin D. Brown, (4) Diane S. Dayhoff, (5) Lawrence H. Silber, (6) Arthur L. Soucy, (7) Lori A. Walker, and (8) Edward D. Ward, related party non-defendant director Ronald Keating joined the board in March 2025 after the relevant period concluded.  These nine defendants are the "Demand Board."

161.    Plaintiff needs only to allege demand futility as a majority of the Directors, or five of the nine, who are on the Board at the time this action is commenced.  Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Hayward Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

162.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

163.    Upon information and belief, in their capacity as members of the Company's Board, board committees, and committee chairs, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Holleran Because of His**
**Principal Professional Occupation as the Company's CEO and President**

164.    Holleran assumed the positions of the Company's CEO and President in August 2019.  Holleran is also a member of the Board since August 2019. As such, it is reasonable to infer that due to the importance of the Company's sales and revenue figures (a metric held in high regard by investors), Defendant Holleran would have been aware of the Company's efforts

to continue to inflate those figures, or fail to take reasonable and adequate measures to report them accurately without a channel stuffing distortion.

165.    In his role as CEO of the Company in fiscal years 2023 and 2024, Defendant Holleran received  $4,974,496 and  $6,023,949 in total compensation, respectively. The Company does not claim that Defendant Holleran is an independent director and because his primary source of income and primary employment is his employment as President and CEO of Hayward and his professional reputation is inextricably bound to his role at Hayward.  As such, Defendant Holleran is incapable of acting independently and demand is futile upon him.  The Company's 2025 Proxy stated:

> Board composed of all independent, non-employee directors, other than Kevin Holleran, our Chief Executive Officer

166.    Additionally, Defendant Holleran is also a named defendant in the pending Related Securities Action in which a motion to dismiss was denied. Accordingly, he is incapable of considering a demand to commence and vigorously prosecute the claims asserted in this Action with the required independence and disinterest.

**Demand is Futile as to Audit Committee Defendants**

167.    Demand is futile as to Defendants Dayhoff, Soucy, Walker, and Felice (the "Audit Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

168.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein, *supra*.

169.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the

Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

170.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's utilization of the upfront billing model, specifically, information concerning the Company's pursuit of upfront billing sales contrary to their public statements. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile to the Director Defendants For Personally Signing
<u>and Adopting False and Misleading Statements in SEC Filing 10-K</u>**

171.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile and therefore excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

172.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's

business and financial prospects, which would reasonably put them on notice that the statements

they were making were in fact false and misleading.

173.    Each of the Director Defendants were responsible for reviewing and approving

the Company's public statements made in press releases and financial filings with the SEC

throughout the Relevant Period.

174.    For instance, on March 9, 2022, the company filed its 2021 10-K with the SEC.

That 10-K was signed by director defendants Holleran, Brown, Dayhoff, Felice, Silber, Soucy,

Walker ("the 2021 10-K"). The 2021 10-K again touted Hayward's net sales growth and

attributed the growth to "market demand, expansion of [Hayward's] trade customers, and

product offering[s]."

175.    By authorizing the false and misleading statements and material omissions and

described above during the Relevant Period concerning the Company's business and prospects,

each of the Director Defendants knowingly faces a substantial likelihood of liability for their

participation in the illicit acts alleged herein.

176.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of

liability such as to create a reasonable doubt as to their impartially consider a demand to sue

themselves in the present action.

**Demand is Futile to the Director Defendants For Personally Signing**
**and Adopting False and Misleading Statements in a Proxy SEC Filing**

177.    Director Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown,

McFadden, Walsh, Bertrand, Brenneman, and Soucy were responsible for issuing Hayward's

materially misleading Definitive Proxy Statement filed April 8, 2022 (the "2022 Proxy").

178.    It is against public policy to indemnify individuals for violations of section 14(a)

of the Exchange Act and Rule 14a-9 promulgated thereunder.

179.    As such, any indemnification provided by the Company to defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, and Soucy does not protect them for violations of section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder in the Company's proxy statements. Accordingly, defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, and Soucy face a substantial likelihood of liability, thereby excusing demand.

**Demand is Futile for a Premature Denial of Wrongdoing
without an Investigation**

180.    Defendant directors Holleran, Ward, Walker, Soucy, Felice, Silber, Brown, Dayhoff, and Keating have already deemed without sufficient, or any, investigation that the misconduct alleged herein is without basis and intends to "vigorously defend" it.

181.    In the 2024 10-K, signed and dated by defendant directors, Holleran, Ward, Walker, Soucy, Felice, Silber, Brown, Dayhoff, and Keating, these defendant directors committed to denying the allegations in the Securities Class Action stating:

> We dispute the allegations of wrongdoing in the Securities Class Action and the Derivative Action and intend to vigorously defend ourselves in these matters. In view of the complexity and ongoing and uncertain nature of the outstanding proceedings and inquiries, at this time we are unable to estimate a reasonably possible financial loss or range of financial loss, if any, that we may incur to resolve or settle the Securities Class Action and the Derivative Action.

182.    As such, Holleran, Ward, Walker, Soucy, Felice, Silber, Brown, Dayhoff, and Keating, eight of the nine current directors, pre-judged this case, as having no merit or liability exposure to their fellow board members and officers.

183.    Pre-judging the merits of the suit based on prior familiarity and taking action to have it dismissed on the merits before an investigation creates a material question of fact as to these directors' independence.

184.    Notably, despite these directors' denial or refusal to investigate, the court in the Securities Class Action denied in part the defendants' motion to dismiss a few months after the 2024 10-K directors signed the 2024 10-K personally disavowing the allegations in the Securities Class Action.

185.    Even since the court's securities class action decision denying the motion to dismiss, Hayward has made no announcement or public disclosure to launch an investigation or seek accountability from any of the defendants and there is no indication any Demand Board member has taken any steps to investigate the allegations of the Securities Class Action.

186.    The Demand Board's decision to take no action with respect to the Securities Class Action and prejudge the claims herein without considering an investigation is therefore evidence of the fact that the Demand Board has not and will not make an objective analysis of the claims and would not consider any demand objectively.  not protected by the business judgment rule.

187.    Delaware law treats a conscious failure to act as the equivalent of action, so if a plaintiff brings a clear violation to the directors' attention and they do not act, then it is reasonably conceivable that the directors' conscious inaction constitutes a breach of duty.  At the very least, the Demand Board had and has a fiduciary duty to take a neutral position in the Securities Action and consider conducting an unbiased investigation. It has been over 2 years since the Hayward Board was served with a shareholder derivative action but has not undertaken any investigation.

188.    Given this staunch and premature denial, and continued refusal to consider an investigation, it is evident these directors would and have preemptively refused a demand.

**Insurance Considerations**

189.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hayward. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of Hayward, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

## FIRST CLAIM

**Against Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown,
Soucy, Afraz, Peters, McFadden, Walsh for Violations of Section 14(a) of the Exchange Act**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

191.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

192.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

193.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

194.    NASDAQ rules require that a "majority of the board of directors must be independent Directors meaning they must not be people who have a relationship which in the opinion of the Company's board would interfere with the exercise of judgment carrying out the responsibilities of a director. The board has a "responsibility to make an affirmative representation that no such relationship exists." *See* NASDAQ Rules 5605(a)(2); (b)(1); NASDAQ Rule IM-5605.

195.    Under the direction of Defendants Holleran, Walker, Dayhoff,  Felice, Silber, Brown, Soucy, Afraz, Peters, McFadden, Walsh, the 2022 Proxy Statement failed to disclose that the Hayward Board and Defendant Holleran violated their fiduciary duties to Hayward and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Hayward core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly

regarding the Company's Distributor demand and inventory; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2022 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

196.    In the exercise of reasonable care, Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, Soucy, Afraz, Peters, McFadden, Walsh should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading and omitted material information.

197.    The false and misleading statements in, and information omitted from, the 2022 Proxy Statement were material to Hayward's stockholders in determining whether to, among other things, elect Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, Soucy, Afraz, Peters, McFadden, Walsh to the Board and approve executive compensation.

198.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

199.    Plaintiff, on behalf of Hayward, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, Soucy, Afraz, Peters, McFadden, Walsh to the Board and the approval of executive compensation.

## SECOND CLAIM

### Against The Individual Defendants for
### Contribution Under Section 21D of the Exchange Act

200.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

201.     The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

202.     Hayward is named as a defendant in related securities fraud class action lawsuits that allege and assert claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Hayward is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

203.     As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Hayward's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

204.     The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the

federal securities laws. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    The Individual Defendants, by virtue of their positions with Hayward and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hayward and officers and directors who made or allowed the dissemination of the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Hayward to engage in the illegal conduct and practices complained of herein.

207.    Plaintiff, on behalf of Hayward, has no adequate remedy at law.

## FOURTH CLAIM

### Against The Director Defendants To Rescind Their
### Compensation Under Section 29(B) Of The Exchange Act

208.    Plaintiff incorporates by reference and realleges each and every preceding allegation set forth above, as though fully set forth herein.

209.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

210.    According to the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970), the principle that corporate contracts can be avoided under the securities laws is well-established (footnotes omitted):

211.    This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party. Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

212.    The agreement between CCMP and AIMco and MSD and Hayward for Hayward to purchase over 8 million shares of Hayward stock as part of the May 2022 secondary offering for selling shareholders  had as its objective the purchase and sale of Hayward stock while sellers were in possession of MNPI and while the participants were making materially false and misleading statements about Hayward to facilitate the contracts misidentified herein, violated  the securities laws while performing their duties under various agreements they had with ZBH for director services, and ZBH is entitled to rescission of those agreements.

213.    Hayward was and is an innocent party with respect to Director Defendants' Exchange Act violations.

214.    Plaintiff, on behalf of Hayward , seeks rescission of the contracts identified due to these defendants' violations of the Exchange Act required under those contracts.

215.    As a result of the foregoing, Hayward is entitled to rescission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## FIFTH CLAIM

### Breach of Fiduciary Duty / Brophy Claim
### (Derivatively Against Insider Trading Defendants)

216.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217.    The Insider Trading Defendants purchased sold stock when they knew the price of that stock was temporarily and artificially inflated as a result of the false and misleading statements regarding distributor inventory and demand.

218.    At the time they sold such stock, they had knowledge of the general status of distributor inventory and demand.

219.    This information included, but was not limited to, the fact that the Company's distributor inventory was bloated and stagnant and revenue and sales growth were not only unhealthy but experiencing substantial decreases from prior quarters and years.

220.    The information to which the parties had access was material, non-public information.

221.    This information was available to and was relied upon by the Insider Trading Defendants when they chose to sell their stock as evidenced by the large percentages sold, the timing, and the disparate trading patterns from other quarters outside the relevant period.

222.    The material, nonpublic information concerned the Company's performance leading up to the stock sales and its expected performance in the near future.

223.    This information regarded the Company's business and financial condition and was not known or knowable to the general investing public.

224.    The Insider Trading Defendants used the Company's own information to profit for their own gain before the public was made aware of the material nonpublic information. This

70

profit constitutes a breach of the Insider Trading Defendants' fiduciary duties, on which the Company is entitled to impose a constructive trust and to require the disgorgement of any additional profits obtained thereby.

225.    Plaintiff and the Company have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

226.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

227.    The Individual Defendants owed and owe fiduciary duties to Hayward.

228.    By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Hayward the highest obligation of good faith and loyalty in the administration of Hayward's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Hayward alleged herein.

229.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

230.    The Individual Defendants each violated their fiduciary duties to Hayward and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Hayward's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly

regarding the Company's distributor inventory and demand (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

231.    The individual defendants further breached their fiduciary duties to Hayward by, inter alia, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

232.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Hayward's affairs and in the use and preservation of Hayward's assets.

233.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Hayward has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

234.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SEVENTH CLAIM

### Against The Individual Defendants For Waste of Corporate Assets

235.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

236.    As a further result of the foregoing, Hayward will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the securities class action lawsuits), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

237.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238.    Plaintiff, on behalf of Hayward, has no adequate remedy at law.

## EIGHTH CLAIM

### Against The Individual Defendants For Aiding And Abetting

239.    Plaintiff incorporates by reference and reallege each and every allegation set forth above as if fully set forth herein.

240.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

241.    In committing the wrongful acts, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

242.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein. 202. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that Plaintiff may maintain this action on behalf of Hayward, and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Hayward;

c) Declaring that Defendants Holleran, Walker, Dayhoff, Felice, Silber, Brown, Soucy, Afraz, Peters, McFadden, Walsh violated Section 14(a) of the Exchange Act;

d) Declaring that the Individual Defendants violated Sections 20(a) and 21D of the Exchange Act;

e) Determining and awarding to Hayward the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

f) Directing Hayward to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

g) Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

h) Awarding to the Company restitution from Defendants, and each of them;

i) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

j) Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 22, 2025                 **SQUITIERI & FEARON, LLP**


By:*/s/Olimpio Lee Squitieri*
            Olimpio Lee Squitieri
205 Hudson Street
7th Floor
New York, New York 10013
Tel:  (212) 421-6492
Fax:  (212) 421-6553

**MOORE LAW, PLLC**
Fletcher Moore (pro hac vice forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 709-8245
Facsimile: (917) 634-3035
fletcher@fmoorelaw.com

Attorneys for Plaintiff

## VERIFICATION

I, Scott Hertzog, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this day of  [  21/08/25      ]

Scott Hertzog